**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————————— x

DUBAI EQUINE HOSPITAL,

                       Plaintiff,

                       v.

EQUINE IMAGING, LLC *doing business as*
FOUR DIMENSIONAL DIGITAL IMAGING,
LLC *doing business as* 4DDI and GEORGE
PAPAIOANNOU,

                       Defendants.

———————————————————————————— x

Index No.: 18-cv-6925 (VSB)

**<u>CORRECTED COMPLAINT</u>**

**<u>JURY TRIAL DEMANDED</u>**

       Plaintiff Dubai Equine Hospital ("Plaintiff" or "DEH") files this Complaint against defendants Equine Imaging, LLC d/b/a Four Dimensional Digital Imaging, LLC d/b/a 4DDI ("4DDI") and George Papaioannou ("Papaioannou" and together with 4DDI, "Defendants"), upon personal knowledge as to its own actions and upon information and belief as to all other matters, as follows:

## I.

## <u>PRELIMINARY STATEMENT</u>

      1.     DEH files this action against Defendants to recover the money DEH paid Defendants for a CT scanner that Defendants never delivered, as well as the damages DEH suffered in making itself whole as a result of Defendants' fraud, breach of contract and other wrongful actions.

1

2.      DEH is a world class equine hospital that supports the horse industry throughout the Middle East.  In 2015, DEH needed to purchase a CT scanner to allow its expert doctors greater ability to assist its patients in viewing structures, such as tendons, bones and joints, inside the bodies of the horses they treat.  To this end, DEH's Chief Surgeon and Clinical Director, Dr. Tom Yarbrough, met Papaioannou, sole owner and President of 4DDI, who represented to Dr. Yarbrough and DEH that Defendants' CT scanners were commercially ready, stable, capable of imaging all body parts of a horse *while a horse was moving* and would be delivered to DEH for use in its veterinary hospital in May or June 2015.

3.      As a result of Defendants' representations, on March 1, 2015, DEH executed an agreement ("Agreement") with Defendants to purchase an Equimagine 4, one type of Defendants' machines with four robotic arms, for $995,000, and paid Defendants a deposit of approximately $550,000.  Defendants, however, failed to deliver a machine to DEH by June 2015, or anytime thereafter, despite DEH's repeated requests.  In addition, Dr. Yarbrough discovered that many of Defendants' critical representations about 4DDI's technology were not true.  In fact, DEH realized that instead of using its deposit to purchase parts and materials for its order, Defendants used DEH's money to develop the technology for the machines that Papaioannou previously represented to Dr. Yarbrough already existed.  Further, Dr. Yarbrough learned that Defendants had systematically defrauded most of its other customers, also by misrepresenting the machines' technology and due dates in which Defendants could deliver machines.

4.      As a result, with Defendants' knowledge, DEH took matters into its own hands by constructing a machine with two robotic arms on its own.  In particular, DEH purchased its own robotic arms from the manufacturer.  In addition, DEH, through an agent, paid Defendants for the

ancillary parts needed for the machine.  DEH also paid technicians to tune, focus and install the machine.

5.      Thereafter, DEH learned that Defendants never paid the manufacturers for the ancillary parts it sold DEH and, as a result, the manufacturers consider the parts to be stolen and refuse to provide DEH with service.

6.      In total, DEH paid approximately $1.2 million, did not receive a machine with four robotic arms by June 2015, as required by the Agreement between the parties, only received a machine with two robotic arms and was required to pay engineers and other professionals and incurred other installation costs to install the machine on its own.  Thus, because of Defendants' actions, DEH was forced to overpay by at least $1 million and incurred other costs as a result of Defendants' misrepresentations.  Accordingly, DEH files this suit against Defendants for return of its $1 million overpayment, among other forms of relief.

## II.

## PARTIES

### A.      Plaintiff

7.      DEH is an equine hospital located in Dubai, United Arab Emirates that offers advanced services in equine medicine and surgery.  DEH is located at 2 Street # 22A, Dubai, United Arab Emirates.

### B.      Defendants

8.      4DDI is a Delaware limited liability company with a principal place of business in New York.  4DDI's last known office location is 1363 Lincoln Avenue, Unit 8, Holbrook, New York.  At all relevant times to this action, 4DDI's principal office location was at 420 Central Park

West, Unit 4BC, New York, New York 10025.  4DDI purports to manufacture, sell and service robotic CT scanners.  Two of its purported products are the Equimagine 2 and the Equimagine 4.

9.      Papaioannou is an individual with a domiciliary of New York.  Papaioannou has a last known residence at 4 Beach Plum Lane, St. James, New York 11780.  At all relevant times to this action, Papaioannou resided at 420 Central Park West, Unit 4BC, New York, New York 10025.  Papaioannou is the sole owner and President of 4DDI.

### III.

### JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2).

11.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2) because, at all relevant times, 4DDI had its principal place of business and Papaioannou resided in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

### IV.

### FACTUAL BACKGROUND

**A.      DEH Is A World Class Equine Hospital Supporting The Horse Industry
         Throughout The Middle East.**

12.     DEH was founded in 1995 under the patronage of His Highness Sheikh Mohammed Bin Rashid Al Maktoum to provide veterinary care for horses in Dubai.

13.     Since that time, DEH has developed into a world class equine hospital that supports the horse industry throughout the Middle East.

14.     DEH prides itself in offering advanced services in equine medicine and surgery in cutting-edge facilities by the most qualified and experienced staff.

**B.** **Papaioannou Made False Representations To DEH About The Machines In An Effort To Induce DEH To Purchase Them.**

15.     In early 2015, DEH and its doctors sought a new CT scanner to allow DEH's surgeons to have detailed images of structures, such as tendons, bones and joints, inside the bodies of the horses they treat.

16.     In February 2015, DEH's Chief Surgeon and Clinical Director, Dr. Tom Yarbrough, was sent a video created by Defendants of 4DDI's purported technology.

17.     In particular, the video illustrated CT scanners Defendants purported to manufacture, named the Equimagine 2 and Equimagine 4, which consist of two or four robotic arms (depending on the model), that swing around the horse and take 3D images.

18.     This video falsely represented to Dr. Yarbrough that Defendants' machines were commercially viable, stable, and able to image all body parts of a horse—all while the horse was *moving*.

19.     Thus, Defendants' purported to sell a CT scanner unlike any other available on the market at the time.  Defendants purported that their technology allowed a horse to move while the image is being taken, allowing doctors greater ability to assess abnormalities within a horse's body that may be causing pain or other problems.  This is important because horses cannot communicate with doctors regarding the location of their pain.  Therefore, if doctors have the ability to image a horse while moving, doctors would have a greater understanding of a potential problem.

20.     In addition, Defendants claimed their technology eliminated the need for general anesthesia, which could be harmful to horses.

21.     The video also presented images purportedly created by the machine of soft tissue structures, such as tendons, bones and joints, which were extremely clear.

22.     After viewing this video, Dr. Yarbrough was very impressed because Defendants' representations regarding their technology were groundbreaking and far beyond the technology that existed at the time.

23.     In order to learn more about Defendants' purported technology, Dr. Yarbrough requested to meet Papaioannou.

24.     As a result, two weeks later, on or about the end of February 2015, Dr. Yarbrough traveled to New York, New York to meet Papaioannou.  Papaioannou arranged to meet Dr. Yarbrough at a meeting space in a high-end hotel in Manhattan.

25.     At the meeting, Papaioannou presented Dr. Yarbrough with a slide show presentation, which made the same false representations as the video.

26.     In particular, Papaioannou falsely represented that the machines were commercially viable, stable and able to image all body parts of a horse.

27.     In addition, Papaioannou presented Dr. Yarbrough with images purportedly created by the machine of soft tissue structures in humans, such as tendons, bones and joints, which were extremely clear.

28.     Further, Papaioannou falsely represented that the machine's advanced motion correction would allow Dr. Yarbrough and the other doctors at DEH to image horses while awake, standing and moving—eliminating the need for anesthesia and allowing doctors greater ability to assess abnormalities within a horse's body that may be causing pain or other problems.

29.     Papaioannou also represented that if DEH immediately executed a purchase order for an Equimagine 4, a machine with four robotic arms, for $995,000 and paid a deposit of approximately $550,000, that Defendants would install the machine by June 2015.

30.     In fact, in the proposal Papaioannou provided DEH, Papaioannou promised to provide "expedited shipping" to ensure that the machine was installed by May or June 2015.

**C.     As A Result Of Defendants' False Representations, DEH Executes A Purchase Order For A Machine And Pays A Substantial Deposit.**

31.     Based on Papaioannou's false representations about Defendants' technology and the fact that Defendants agreed to install a machine by June 2015, on March 1, 2015, DEH executed an Agreement with Defendants to purchase a machine with four robotic arms for $995,000.00.

32.     In furtherance of the Agreement, on March 22, 2015, DEH paid its first deposit by wiring 4DDI $248,750.00.

33.     In addition, on June 24, 2015, DEH paid Defendants the second deposit of $297,354.00 via wire transfer.  Thus, DEH paid Defendants a total of $546,104.00 as the deposit for the machine (the "Deposit").

**D.     Dr. Yarbrough Discovers Papaioannou's False Representations.**

34.     After DEH paid Defendants the Deposit, Defendants failed to deliver the machine in May or June 2015, despite DEH's repeated requests.

35.     Instead, Defendants moved back the delivery date to July or August 2015.

36.     Thereafter, Dr. Yarbrough discovered that Defendants had falsely represented the machine's technology.

37.     For example, Dr. Yarbrough viewed a demonstration of 4DDI's machine at ABB Robotic's ("ABB") offices in Michigan, where Defendants' operated a manufacturing facility. ABB is the manufacturer of the machine's robotic arms.

38.     At ABB's facility, Dr. Yarbrough realized that Defendants' technology was not commercially viable, stable or able to image all parts of an animal's body without anesthesia, as promised by Papaioannou.

39.     In particular, contrary to Papaioannou's previous representations that horses did not need to be anesthetized prior to being imaged by the machines, Dr. Yarbrough discovered that Papaioannou had not yet developed the machine's motion correction software.  Thus, to the extent a horse moved while being scanned, the images would be blurry and unusable.  As a result, DEH would need to anesthetize a horse in order to scan it using the machine.

40.     Therefore, instead of using the Deposit to purchase the parts and materials needed for DEH's order, Defendants used DEH's Deposit to fund the development of the machine's technology.

41.     Around the same time, Dr. Yarbrough also began realizing that Defendants had systematically defrauded many—if not all—of its customers using the same misrepresentations regarding the machine's technology and delivery dates.

42.     In particular, over time, Dr. Yarbrough learned that Defendants defrauded other veterinary hospitals in California, Indiana, New Jersey, New York, Pennsylvania and Texas, among other states, as well as Defendants' distributor in Ohio.

**E.     DEH Demands Delivery Of Their Machine And, When Papaioannou Refuses, DEH Takes Matters Into Its Own Hands.**

43.     After the scheduled delivery date in June 2015 passed, DEH and Dr. Yarbrough repeatedly requested that Papaioannou finalize the technology and send DEH its machine. Papaioannou, however, failed to do so.

44.     As a result, and with Defendants' knowledge and agreement, in November 2016, DEH arranged with ABB and one of Papaioannou's then-employees to partially complete the order.

45.     In particular, although DEH originally contracted with Papaioannou and 4DDI for one machine with four robotic arms, it realized that Papaioannou had misappropriated the Deposit and would not apply that money to DEH's order.

46.     Thus, DEH concluded that if it wanted a machine, it would need to contract with others to procure it on its own.

47.     As a result, in November 2016, DEH contracted with ABB directly to purchase two robotic arms for a machine for a total of $185,000.  On November 21, 2016, DEH wired $185,000 to ABB for these robotic arms.  In addition, DEH wired ABB $6,784.00 in freight charges to ship the robots to Dubai. As a result, ABB shipped robots to DEH's hospital.

48.     Papaioannou was aware DEH purchased the robotic arms from ABB.  In fact, he was copied on many of the communications between DEH and ABB relating to this order.

49.     Further, in November 2016, DEH sent Papaioannou's then-employee, Mike Hellmann, $335,500 to purchase the ancillary parts necessary to construct a machine, such as an X-ray machine, an X-ray panel, and motion correction cameras, among other parts.

50.     Hellmann knew, however, that Papaioannou had these parts in 4DDI's warehouse.

51.     As a result, in November 2016, Hellmann advised Papaioannou that he would purchase the parts for DEH from Papaioannou and would ship such parts to Dubai from 4DDI's warehouse in order for DEH to construct is own machine.

52.     Once DEH received the robots and ancillary parts, it paid engineers and other professionals to tune, focus and install the machine, which cost approximately $200,000.

53.     Therefore, in total, DEH paid approximately $1.2 million, did not receive its machine by June 2015, as required by the Agreement, only received a machine with two robotic

arms instead of four and was required to pay engineers and other professionals and incur additional installation costs to install the machine on its own.

**F.   DEH Discovers That Defendants Never Paid The Manufacturers For The Ancillary Parts That DEH Purchased From Defendants And, Therefore, The Manufacturers Consider Them To Be Stolen Goods.**

54.   After DEH successfully installed the machine at its hospital, the X-ray machine required service.  As a result, DEH called the manufacturer of the X-ray machine and requested assistance.  Once DEH provided the serial number on its X-ray machine to the manufacturer, however, the manufacturer advised DEH that Defendants never paid for the X-ray machine.

55.   Thereafter, Dr. Yarbrough called the manufacturers for several other components of the machine who all told Dr. Yarbrough that Defendants had similarly never paid for such parts. As a result, the manufacturers refused to provide DEH service for such parts.

56.   Thus, DEH, through Hellman, paid Defendants an additional $335,000 for component parts for the machine that were all stolen.

57.   Therefore, DEH paid approximately $1.2 million for a machine but only received $185,000 in value—the amount DEH paid ABB directly for the robotic arms.

**V.**

**CLAIMS**

**A.   COUNT 1:  VIOLATION OF SECTION 349(a) OF THE N.Y. GENERAL BUSINESS LAW (Against All Defendants)**

58.   Plaintiff repeats and realleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein.

59.   Defendants falsely represented to DEH and the general public including customers in California, Indiana, New Jersey, New York, Pennsylvania and Texas, among other states, that the machines were commercially viable, stable and able to image all of a horse's body parts without

anesthesia and while a horse was in motion.  In addition, Defendants showed DEH and its other customers images purportedly created by the machines of soft tissue structures, such as tendons, bones and joints, which were extremely clear.  Further, Defendants represented to DEH and other customers around the country false delivery dates.

60.     After paying the Deposit and travel expenses in connection with DEH's purchase of a machine, however, DEH discovered that Defendants' representations about the delivery date of the machine, as well as the capability of the machines, were false.

61.     In particular, Defendants failed to deliver a machine by June 2015, as promised in the Agreement, or anytime thereafter.

62.     In addition, Defendants made false representations to DEH regarding the machines' quality of soft tissue images and functionality.  Before paying the Deposit, Defendants showed DEH clear images of soft tissue structures, which Defendants falsely claimed the machines could produce.  In actuality, however, the soft tissue images created by the machines did not contain the requisite clarity or detail reflected in the images Defendants provided before receiving the Deposit. Further, before paying the Deposit, Defendants claimed that the machine could image a horse while it was moving and without anesthesia.  In actuality, however, Defendants had not developed that technology.

63.     Defendants' misrepresentations to DEH regarding the delivery date and functionality of the machines were deceptive and material because, as a result, Plaintiff relied on Defendants' misrepresentations and paid Defendants the Deposit, among other costs in connection with their purchase of a machine.

64.     Defendants' conduct in selling the machines is consumer-oriented because Defendants have marketed and are marketing the machines to other consumers using the same misrepresentations asserted to Plaintiff.

65.     As a direct and proximate result of Defendants' fraudulent misrepresentations and wrongful actions, DEH has suffered damages in an amount to be determined at trial or by the Court.

66.     Pursuant to New York law, DEH is also entitled to an award of treble damages and reasonable attorneys' fees and costs.

**B.      COUNT 2: BREACH OF CONTRACT (Against All Defendants)**

67.     DEH repeats and realleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein.

68.     On March 1, 2015, DEH executed the Agreement with Defendants in which Defendants promised to deliver a machine with four robotic arms to DEH by June 2015 in exchange for $995,000.00.

69.     DEH performed pursuant to the Agreement because DEH paid Defendants approximately $550,000 in deposits pursuant to the Agreement, with the remaining amount due at the time of installation.

70.     Defendants, however, failed to perform pursuant to the Agreement because they failed to deliver a machine by June 2015 or anytime thereafter, despite multiple demands from DEH.

71.     As a result, DEH has suffered damages in an amount to be determined at trial or by the Court.

C.     **COUNT 3: FRAUD (Against All Defendants)**

72.     DEH repeats and realleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein.

73.     During the course of their meetings, Defendants falsely represented to DEH that it would deliver a machine with four robotic arms by June 2015.

74.     DEH relied on the representations made by Defendants and, as a result, paid Defendants a deposit of approximately $550,000 for a machine and paid thousands of dollars in travel and other expenses in connection with DEH's purchase of a machine.

75.     After paying the deposit, however, DEH discovered that Defendants' representations about the delivery date of the machine were false because Defendants failed to deliver a machine in June 2015 or anytime thereafter.   In addition, DEH discovered that Defendants' representations about the capability of the machine were false and that Defendants were using DEH's Deposit to develop the machine's technology.

76.     After never receiving a machine, in November 2016, DEH contracted with ABB directly—with Defendants' knowledge—to purchase two robotic arms for a machine for a total of $185,000.  On November 21, 2016, DEH wired $185,000 plus shipping to ABB to purchase these robots.

77.     In addition, on December 6, 2016, DEH sent Papaioannou's then-employee, Mike Hellmann, $335,500 to purchase the ancillary parts necessary to construct a machine.

78.     Hellmann knew, however, that Papaioannou was housing these parts in 4DDI's warehouse.

79.     As a result, Hellmann advised Papaioannou that he would purchase the ancillary parts DEH needed to construct its machine directly from Papaioannou and send such parts to DEH

from 4DDI warehouse.  Unbeknownst to Hellmann, however, Papaioannou had not paid the manufacturers for such parts.  As a result, the manufacturers consider such parts stolen and refuse to provide DEH with service.  Thus, DEH, through Hellmann, paid Papaioannou an additional $335,000 without obtaining such value.

80.     Once DEH received the robots and ancillary parts, it had to separately pay engineers and other professionals to tune, focus and install the machine, which cost approximately $200,000.

81.     Therefore, DEH paid approximately $1.2 million, did not receive its machine in June 2015, as required by the Agreement, only received a machine with two robotic arms instead of four and was required to pay engineers and other professionals and incur other installation costs to install the machine on its own.

82.     Defendants made the misrepresentations about the delivery date and functionality of the machine to DEH and Defendants' ownership of the ancillary parts with knowledge of their falsity and with the intention that DEH or its agent Hellmann rely on the misrepresentations to induce DEH to purchase the machine and/or ancillary parts from Defendants.

83.     DEH detrimentally relied on Defendants' false representations regarding the delivery and functionality of the machine and Defendants' ownership of the ancillary parts and paid Defendants approximately $885,000 based on that reliance, paid approximately $200,000 to pay technicians to tune, focus and install the machine and thousands of dollars in travel and other expenses in connection with DEH's purchase of a machine.

84.     DEH reasonably relied on Defendants' misrepresentations because the information provided by Defendants about the delivery date and functionality of the machine and Defendants' ownership of the ancillary parts was uniquely within Defendants' knowledge.  In addition, DEH was not aware of any facts indicating Defendants' representations were false.

85.     As a direct and proximate result of Defendants' fraud, DEH has suffered damages in an amount to be determined at trial or by the Court.

86.     DEH is also entitled to an award of exemplary and punitive damages against Defendants because their conduct was wanton and willful as a result of their conscious and deliberate disregard for DEH's interests.

**D.     COUNT 4: FRAUD IN THE INDUCEMENT (Against All Defendants)**

87.     DEH repeats and realleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein.

88.     During the course of their meetings, Defendants falsely represented to DEH that if it paid a deposit of approximately $550,000 that Defendants would deliver a fully functioning machine with four robotic arms to DEH by June 2015, with the remaining payment of $445,000 due at installation.

89.     Defendants knew, however, at the time that those representations were not true.

90.     Defendants failed to deliver a machine to DEH in June 2015 or anytime thereafter, despite DEH's repeated requests.

91.     As a result, in November 2016, DEH contracted with ABB directly to purchase robots for a machine for a total of $185,000.  On November 21, 2016, DEH wired $185,000 plus shipping to ABB.

92.     In addition, on December 6, 2016, DEH sent Papaioannou's then-employee, Mike Hellmann, $335,500 to purchase the ancillary parts necessary to construct a machine.

93.     Hellmann knew, however, that Papaioannou was housing these parts in 4DDI's warehouse.

94.     As a result, Hellmann advised Papaioannou that he would purchase the ancillary parts DEH needed to construct a machine directly from Defendants and send such parts to DEH from 4DDI's warehouse.  Unbeknownst to Hellmann, however, Papaioannou had not paid the manufacturers for such parts.  As a result, the manufacturers consider such parts stolen and refuse to provide DEH with service for the parts.

95.     Once DEH received the robots and ancillary parts, it had to separately hire engineers and other professionals to tune, focus and install the machine, which cost approximately $200,000.

96.     Therefore, DEH paid approximately $1.2 million, did not receive its machine in June 2015, as required by the Agreement, only received a machine with two robotic arms instead of four and was required to pay engineers and other professionals and incur other costs to install the machine on its own.

97.     Defendants made the false representations about the machine in an effort to induce DEH to purchase a machine.  In addition, Defendants sold the ancillary parts to DEH, through Hellman, with knowledge that they were stolen.

98.     Indeed, in reliance on the representations made to DEH regarding delivery by June 2015 and Defendants' ownership of the ancillary parts, DEH paid Defendants approximately $885,000 and paid thousands of dollars in travel and other expenses in connection with DEH's purchase of a machine.

99.     DEH reasonably relied on Defendants' misrepresentations because the information provided by Defendants about the machine and Defendants' ownership of the ancillary parts was uniquely within Defendants' knowledge.  In addition, DEH was not aware of any facts indicating Defendants' representations were false.

16

100.     As a direct and proximate result of Defendants' fraudulent misrepresentations, DEH has suffered damages in an amount to be determined at trial or by the Court.

101.     DEH is also entitled to an award of exemplary and punitive damages against Defendants because their conduct was wanton and willful as a result of their conscious and deliberate disregard for DEH's interests.

E.      **COUNT 5: UNJUST ENRICHMENT (Against All Defendants)**

102.     DEH repeats and realleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein.

103.     DEH paid Defendants a deposit of approximately $550,000 to purchase a machine with four robotic arms, which was to be delivered by June 2015.

104.     After tendering this payment, however, DEH discovered that Defendants' representations regarding the capability of the machine were false.

105.     In addition, DEH learned that Defendants were using the approximately $550,000 deposit to develop their purported technology.

106.     Furthermore, Defendants failed to deliver DEH's machine in June 2015 or anytime thereafter, despite DEH's repeated requests.

107.     As a result of Defendants' false representations and Defendants' failure to deliver DEH's machine as promised, DEH was forced to fill its order for a machine on its own. Specifically, in November 2016, DEH contracted with ABB directly to purchase robots for a machine for a total of $185,000.  On November 21, 2016, DEH wired $185,000 plus shipping to ABB.

108.     In addition, on December 6, 2016, DEH sent Papaioannou's then-employee, Mike Hellmann, $335,500 to purchase the ancillary parts necessary to construct a machine.

109.     Hellmann knew, however, that Papaioannou had the ancillary parts in 4DDI's warehouse.

110.     As a result, Hellmann paid Papaioannou for the ancillary parts and sent such parts to DEH.  Unbeknownst to DEH or Hellmann, however, Defendants had not actually paid for the ancillary parts.  To this day, Defendants have not paid the manufacturers for such parts.

111.     Once DEH received the robots and ancillary parts, it had to separately pay engineers and other professionals to tune, focus and install the machine, which cost approximately $200,000.

112.     Therefore, DEH paid Defendants approximately $885,000 and did not receive its machine in June 2015, as required by the Agreement, or anytime thereafter, and paid Defendants for stolen ancillary parts to which the manufacturers refuse to provide service.

113.     Accordingly, Defendants have been unjustly enriched and it is against equity and good conscience to permit Defendants to retain the benefits they have received at the expense of DEH.

**F.     COUNT 6: MONEY HAD AND RECEIVED (Against All Defendants)**

114.     DEH repeats and realleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein.

115.     After meeting with Defendants, DEH paid a deposit of approximately $550,000 to Defendants toward the purchase price a machine with four robotic arms, which was to be delivered by June 2015.

116.     After tendering the payment, DEH repeatedly requested confirmation that Defendants would deliver the machine to DEH by June 2015.

117.     Defendants, however, failed to deliver the machine to DEH by June 2015 or anytime thereafter.

118.     As a result, in November 2016, DEH contracted with ABB directly to purchase two robots for a machine for a total of $185,000.  On November 21, 2016, DEH wired $185,000 plus shipping to ABB.

119.     In addition, in November 2016, DEH sent Papaioannou's then-employee, Mike Hellmann, $335,500 to purchase the ancillary parts necessary to construct a machine.

120.     Hellmann knew, however, that Papaioannou had the ancillary parts in 4DDI's warehouse.

121.     As a result, Hellmann paid Papaioannou for the ancillary parts and then sent them to DEH.  Unbeknownst to DEH or Hellmann, however, Papaioannou had not paid the manufacturer for such parts.

122.     Once DEH received the machine, it had to separately pay engineers and other professionals to tune, focus and install the machine, which cost approximately $200,000.

123.     Therefore, DEH paid approximately $1.2 million, did not receive its machine in June 2015, as required by the Agreement, only received a machine with two robotic arms instead of four and was required to pay engineers and other professionals and incur other installation costs to install the machine on its own.

124.     Defendants, however, inexplicably refuse to refund DEH any money and, thus, have benefitted to the detriment of DEH.

125.     Given Defendants' failure to deliver the machine and failure to pay the manufacturers for the ancillary parts, Defendants have no right or entitlement to any money paid by DEH and, therefore, the funds should be returned to DEH.

126.     Accordingly, DEH has been damaged and equity and good conscience provide that the Defendants should not be permitted to retain the benefits it received at the expense of DEH.

19

127.    DEH is also entitled to an award of exemplary and punitive damages against Defendants because their conduct was wanton and willful as a result of their conscious and deliberate disregard for DEH's interests.

**G.    COUNT 7: CONVERSION (Against All Defendants)**

128.    DEH repeats and realleges each and every allegation contained in the above paragraphs with the same force and effect as if more fully set forth herein.

129.    DEH paid a deposit of approximately $550,000 to Defendants for a machine with four robotic arms to be delivered by June 2015.

130.    After paying the deposit, DEH repeatedly requested that Defendants deliver the machine.  Defendants failed to deliver DEH's machine, despite DEH's repeated requests.

131.    As a result, on November 21, 2016, DEH contracted with ABB directly to purchase robots for a machine for a total of $185,000 plus shipping.

132.    In addition, on December 6, 2016, DEH sent Papaioannou's then-employee, Mike Hellmann, $335,500 to purchase the ancillary parts necessary to construct a machine.

133.    Hellmann knew, however, that Papaioannou had the ancillary parts in 4DDI's warehouse.

134.    As a result, Hellmann paid Papaioannou for the ancillary parts and sent them to DEH.  Unbeknowst to DEH and Hellmann, however, Defendants had not paid the manufacturers for the ancillary parts.

135.    Once DEH received the robots and ancillary parts, it had to separately pay engineers and other professionals to tine, focus and install the machine, which cost approximately $200,000.

136.    Therefore, DEH paid approximately $1.2 million, did not receive its machine in June 2015, as required by the Agreement, only received a machine with two robotic arms instead

of four and was required to pay engineers and other professionals and incur other installation costs to install the machine on its own.

137.    As a result of Defendants' false representations and the fact that Defendants did not deliver a machine as promised, DEH requested return of its $885,000.

138.    Defendants, however, refused to return DEH's $885,000, improperly exercising dominion and control over it.

139.    Thus, DEH has been damaged because Defendants have interfered with DEH's right of possession of its property.

140.    DEH is also entitled to an award of exemplary and punitive damages against Defendants because their conduct was wanton and willful as a result of their conscious and deliberate disregard for DEH interests.

## VI.

## DEMAND FOR RELIEF

WHEREFORE DEH respectfully requests that this Court enter a judgment in its favor against Defendants, jointly and severally, awarding DEH the following relief:

1.    Actual, compensatory, consequential, exemplary, punitive and treble damages in an amount to be determined at trial;

2.    Interest, costs, and disbursements of this action, including reasonable attorney's fees; and

3.    Such other and further relief as this Court deems just and proper.

Dated: August 1, 2018

**MEYNER AND LANDIS LLP**

_____

Catherine Pastrikos Kelly
100 Park Avenue
16th Floor
New York, New York 10016

*Attorneys for Plaintiff*
*Dubai Equine Hospital*