UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

:

DUBAI EQUINE HOSPITAL,                               :

:

                                    Plaintiff,          :

:                        18-CV-6925 (VSB)

                    - against -                          :

:                        **OPINION & ORDER**

EQUINE IMAGING, LLC and GEORGE           :

PAPPAIOANNOU,                                            :

:

                                    Defendants.   :

:

------------------------------------------------------------X

<u>Appearances</u>:

Catherine Maria Pastrikos
Meyner & Landis LLP
Newark, NJ
*Counsel for Plaintiff*

George Papaioannou
Port Washington, NY
*Pro se Defendant*

<u>VERNON S. BRODERICK</u>, United States District Judge:

Plaintiff Dubai Equine Hospital ("Plaintiff") brings this action against Defendants Equine

Imaging, LLC ("Equine Imaging," or the "Corporate Defendant") and George Papaioannou

("Papaioannou" and, together with Equine Imaging, "Defendants") alleging breach of contract,

fraud, fraudulent inducement, unjust enrichment, money had and received, conversion, and

violation of New York General Business Law ("GBL") Section 349, which outlaws deceptive

business practices.  Before me is Plaintiff's motion for summary judgment on all claims.  For the

foregoing reasons, Plaintiff's motion is GRANTED in part and DENIED in part.  Specifically,

Plaintiff's motion is GRANTED as to its claims for breach of contract, fraud, and fraudulent

inducement and DENIED as to its claims for unjust enrichment, money had and received, and conversion and under GBL Section 349.

## I.   **Procedural History**

This case has a lengthy procedural history that is material to the outcome of this Opinion & Order.  Plaintiff initiated this action on August 1, 2018, (Doc. 1), ultimately filing a corrected complaint on August 14, 2018, (Doc. 10).  On August 14, 2019, I denied Defendants' motion to strike portions of Plaintiff's complaint that contained allegations of fraud.  (Doc. 23.) Defendants answered the complaint on September 4, 2019.  (Doc. 25.)

On May 4, 2020, I granted defense counsel's motion to withdraw as attorney due to unpaid legal fees.  (Doc. 46.)  After granting two extensions for Defendants to find new counsel, (Docs. 55, 58), a new attorney filed a notice of appearance on behalf of Defendants, (Doc. 60). Less than three months later, however, this new defense attorney filed a motion to withdraw, also citing unpaid legal fees.  (Docs. 69–70.)  I granted that motion to withdraw on September 21, 2020.  (Doc. 73.)  After Defendants failed to comply with my deadline to find new counsel, (Doc. 76), Plaintiff moved for default judgment against Defendants, (Docs. 83–88). Papaioannou appeared at the order to show cause hearing held on December 30, 2020, requesting more time to produce documents and make discovery requests, even though discovery had concluded on December 21, 2020.  (Doc. 65.)  Following the December 30, 2020 order to show cause hearing, I issued an order granting default judgment as to liability against Equine Imaging and extending the discovery deadline for Papaioannou until March 1, 2021.  (Doc. 93.)  My order warned Papaioannou that I would "not grant any extensions of discovery barring unforeseen exceptional circumstances."  (*Id.*)

At the conclusion of the discovery period, Papaioannou asked for an extension of

discovery deadlines, representing that he was under the mistaken impression that the parties were

required to agree on a date ahead of time for Papaioannou to produce his materials to Plaintiff.

(Doc. 96.)  Relying on Papaioannou's representation that he needed only "a few days" to

complete his production, I extended the deadline for Papaioannou to produce his materials until

March 9, 2021, but prohibited the parties from making any further discovery requests, issuing

any subpoenas or noticing any depositions.  (Doc. 98.)

On March 29, 2021, I (1) denied Papaioannou's request for a further extension of the

discovery deadline, noting the lengthy extensions I had given Papaioannou and the fact that he

had previously represented that he needed only "a few days" to complete discovery; (2) ordered

that the parties could not rely on any materials produced after March 9, 2021 in their summary

judgment briefing; and (3) set a briefing schedule for summary judgment motions, with opening

briefs due on April 27, 2021, responses due on May 12, 2021, and any reply memoranda due on

May 26, 2021.  (Doc. 104.)  In a subsequent order, I clarified that "to the extent the parties

disagree about whether particular materials or documents referenced in summary judgment

materials were produced before or after March 9, 2021, they are directed to address that issue in

their summary judgment briefs."  (Doc. 110.)

On April 14, 2021—before Plaintiff filed its summary judgment motion—Papaioannou

filed a letter that contained two purported affidavits.  One affidavit had the correct parties

included in the case caption, but stated that the affidavit was for the New York State Supreme

Court, New York County, and included a date of February 18, 2021.  (Doc. 109.)  This 26-page

affidavit contained some responses from Papaioannou to representations and arguments that

Plaintiff had previously made in this case.  (*Id.* at 11–36.)  The other affidavit was dated

February 4, 2021 and signed by Christos Mitrogiannis, an engineer who worked with Papaioannou.  (*Id.* at 37–49.)  This affidavit listed a case caption for a different case filed against Defendants in the New York State Supreme Court, New York County, and contained similar content to the first affidavit.  (*Id.* at 37.)

Plaintiff timely filed its summary judgment motion on April 27, 2021, along with a memorandum of law, a statement of facts pursuant to Local Rule 56.1, a notice to Papaioannou regarding the possible consequences of its summary judgment motion, and several declarations and exhibits.  (Docs. 111–14.)  Papaioannou failed to timely file an opposition motion or request an extension of time to do so.  After Plaintiff requested that I consider its motion unopposed, (*see* Docs. 118–19), Papaioannou submitted a letter stating that he was in a bicycle accident on May 2, 2021, in which he tore a muscle in his thigh and that, as a result, he was unable to file his opposition motion, (Doc. 120).  In that filing, Papaioannou requested that I extend the time for him to file his opposition motion to June 15, 2021.  (*See id.*)  On June 3, 2021, I granted Papaioannou's extension request, while warning Papaioannou that I would "not grant any subsequent extension requests and, if [he did] not file his brief by that date, I [would] consider Plaintiff's motion [for summary judgment] as unopposed."  (Doc. 122.)

The only filing I received from Papaioannou between June 3 and June 15, 2021 was a four-page letter.  (Doc. 123.)  In this letter—which is not labeled as an opposition motion to Plaintiff's motion to summary judgment—Papaioannou asked for another extension in order "to submit to the court [his] *Pro se* documents . . . and the digital videos and heavy sized material that cannot be [sent] by email."  (*Id.*)  This letter contained no specific response to the arguments raised in Plaintiff's motion for summary judgment.  (*See id.*)  On June 29, 2021, Papaioannou submitted three more filings.  Two of these filings seemingly were a response to affidavits

submitted by Plaintiff, and Papioannou's two filings had more than 560 pages in exhibits.  (Docs. 124, 128.)  The third filing was a letter in which Papaioannou represented that he did not timely receive my order in which I granted his motion for an extension.  (Doc. 125.)

After this flurry of filings from Papaioannou, I scheduled a conference for July 7, 2021, to discuss the status of summary judgment briefing.  (Doc. 127.)  Papaioannou did not appear for this conference.  (*See* Doc. 131.)  I held another conference on July 14, 2021, during which I directed Papaioannou to submit a filing identifying, by docket number, which materials that were filed on or before June 15, 2021 he intended to serve as his opposition to Plaintiff's motion for summary judgment, and I noted that I would not consider any materials submitted after June 15, 2021.  (Doc. 134.)  I received a slew of filings from Papaioannou on July 19 and July 20, 2021. (*See* Docs. 136–146).  None of these filings identified, in any intelligible way, the filings that Papaioannou intended to serve as his opposition.  Rather, in all these filings, Papaioannou merely (1) provided an introductory paragraph explaining that he had technical difficulties producing his materials before March 2, 2021, and then (2) included a series of emails, images, and other materials likely intended as exhibits.  (*See id.*)  On July 27, 2021, Plaintiff submitted its reply in the form of a letter in which it argued, among other things, that I should treat its motion as unopposed because Papaioannou failed to comply with my order indicating which of his materials I should treat as his opposition motion.  (Doc. 147.)

Finally, my Chambers received two flash drives that Papaioannou sent along with a letter, dated July 16, 2021, stating that the drives "represent a full review of the documents submitted to the docket" in this case.  I will discuss the contents of this flash drive in greater detail *infra.*

## II.   <u>Legal Standard</u>

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see also* Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In considering a summary judgment motion, a court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citation and internal quotation marks omitted); *see also Matsushita*, 475 U.S. at 587.  "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied.  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials. . . ."  Fed. R. Civ. P. 56(c)(1)(A).  If "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2), (3).

"Where a motion for summary judgment is unopposed, summary judgment is proper only if the court is satisfied that the moving party has met its burden with sufficient support in the record evidence." *Lue v. JPMorgan Chase & Co.*, 768 F. App'x 7, 10 (2d Cir. 2019).  Courts therefore may not grant the motion "without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial," and in doing so "may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement." *Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (internal citation and quotation marks omitted).  To deem a fact undisputed for purposes of a decision a court "must be satisfied that the citation to evidence in the record supports the assertion." *Id.*

When summary judgment is sought against a pro se litigant, the movant must provide the pro se litigant with "the papers in support of the motion . . . [and the] 'Notice To Pro Se Litigant Who Opposes a Motion For Summary Judgment' with the full texts of Fed. R. Civ. P. 56 and Local Civil Rule 56.1 attached."  Local Civ. R. 56.2.  Here, Papaioannou received such notice:

Defendants furnished him with their papers, the required notice, and copies of Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 56.1.  (Doc. 111-3.)

Pro se litigants are afforded "special solicitude" on motions for summary judgment. *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988).  Courts read the pleadings, briefs, and opposition papers of pro se litigants "liberally and interpret them 'to raise the strongest arguments that they suggest.'"  *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)); *see also Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (stating that the submissions of pro se litigants are "held to less stringent standards than formal pleadings drafted by lawyers" (internal quotation marks omitted)). However, "pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (internal quotation marks omitted); *see also Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (stating that the obligation to read pro se pleadings liberally "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment" (citation omitted); *Iwachiw v. N.Y. State DMV*, 396 F.3d 525, 529 n.1 (2d Cir. 2005) (noting that "[t]he [Supreme] Court has not . . . 'suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel.'" (quoting *McNeil v. United States*, 508 U.S. 106, 113 (1993))).

### III.   <u>Factual Background</u>

As noted *supra*, in order to find a fact undisputed when a motion for summary judgment is unopposed, I have the responsibility to review the record and "be satisfied that the citation to evidence in the record supports the assertion."  *Vt. Teddy Bear Co.*, 373 F.3d at 244.  For

purposes of this Opinion & Order, I find that all the facts recited below are undisputed because the citations to evidence in the record supports the assertions.

### A.   *The Lead-Up to the Agreement*

Plaintiff is an equine hospital that supports the horse industry in the Middle East.  (Doc. 114 ¶ 3.)  In early 2015, Plaintiff was looking for a new CT scanner that would allow its surgeons to have detailed images of structures—including ligaments, bones, and joints—inside horses' bodies.  (*Id.* ¶ 4.)  In February 2015, Dr. Thomas Yarbrough ("Yarbrough")—Plaintiff's Chief Surgeon and Clinical Director—was sent a video created by Defendants of CT scanners that Defendants purportedly manufactured, in which two or four robotic arms would swing around a horse and create a 3D CT image.  (*Id.* ¶¶ 5–6.)  On or around February 28, 2015, Yarbrough met with Papaioannou in New York City.  (*Id.* ¶ 8.)  As part of Papaioannou's presentation, he showed Yarbrough a slideshow that included the following:

- representations that Defendants' machines were stable, commercially viable, and able to image all parts of a horse's body, (*id.* ¶ 9; Doc. 114-1, at 17, 36.)
- images of soft tissue structures in humans, which Papaioannou represented were generated by the machine, (Doc. 114 ¶ 10; Doc. 114-1, at 21–26, 28, 32–35, 40–41, 45–48, 51–54);
- assurances that the machine could image horses that were awake, standing, and moving, which would eliminate the need for anesthesia, (Doc. 114 ¶ 11; Doc. 114-1, at 12, 44, 50); and
- representations from Papaioannou that if Plaintiff executed a purchase order for a machine with four robotic arms for $995,000, along with a $250,000 deposit, Defendants projected installing the machine by June 2015, (Doc. 114 ¶ 12; Doc. 114-1, at 55).

### B.   *The Agreement*

On March 1, 2015, Yarbrough asked Papaioannou to send him an agreement for Plaintiff to purchase a machine with four robotic arms, (Doc. 114 ¶ 13), which Papaioannou sent later that day, (*id.* ¶ 14).  The parties entered into an agreement for Plaintiff to purchase a machine with four robotic arms for $995,000 that same day.  (Doc. 114-2.)  Yarbrough sent the agreement,

which included a one-year warranty, to Papaioannou by email once it was executed.  (*Id.* at 1;
Doc. 114 ¶¶ 18–19.)

Plaintiff made two deposits pursuant to this agreement.  First, on March 22, 2015,
Plaintiff made a deposit of $248,750.  (Doc. 114-3.)  Second, on June 24, 2015, Plaintiff made a
deposit of more than $297,354.  (Doc. 114-4.)  Plaintiff made the second deposit because
Papaioannou represented that he was ready to ship the machine to Plaintiff.  (Doc. 114 ¶ 21.)  In
total, Plaintiff paid roughly $546,104 to Defendants in connection with the purchase, but the
machine was never delivered to Plaintiff.  (*Id*. ¶¶ 22–23.)

### C.  *Defendants' Capacity and Business Practices at the Time of the Agreement*

Michael Hellman was an employee at Equine Imaging from February to December 2016.
(Doc. 111-6 ¶ 8.)  The entire time that Hellman worked at Equine Imaging, Equine Imaging's
technology was still being developed as a prototype, and was not yet production ready.  (*Id.* ¶¶
41–42.)  Although Equine Imaging's technology could scan a horse's head and lower legs, it
could not scan other parts of a horse's body.  (*Id.* ¶¶ 45–46; Doc. 112 ¶ 5(a)–(c), Doc. 113-1 at
60:23–61:19.)  Nevertheless, Papaioannou told customers that the machine's technology was
fully operational and that the machines were "turnkey."  (Doc. 111-6 ¶¶ 43–44; Doc. 112 ¶ 5(a)–
(c).)[1]  Similarly, before Papaioannou interacted with Plaintiff, he told a client that his machine
could do "a whole[-]body CT" that would require "either no sedation or a very light
tranquilization" of the horse, and that the machine would be able to image a horse's skull,
abdomen, all four legs, and cervix.  (Doc. 113-1, at 11:22–13:1, 14:2–11, 15:14–16:2.)

---

[1] These statements, and others from Papaioannou, are admissible because they are statements of a party opponent.
*See* Fed. R. Evid. 801(d)(2).

At the time Hellman worked for Equine Imaging, there was no engineering budget to manufacture new robotic systems or continue operations, and he never purchased a single piece of robotic equipment.  (Doc. 111-6  ¶¶ 16, 18.)  Also at this time, Papaioannou would use clients' deposits on research and development—not on fulfilling their orders.  (*Id.* ¶ 34.)  When Hellman confronted Papaioannou about this practice and told him that he was using clients' money under false pretenses, Papaioannou stated that he "was not in jail yet." (*Id.*)  On several occasions, after customers would pay Defendants money to purchase a product, Papaioannou would send them equipment that was meant for other customers.  (*Id.* ¶¶ 19–26.)  On at least one occasion, Papaioannou accepted money from a customer only to refuse to fulfill its order.  (*Id.* ¶¶ 27–33; Doc. 113-3 ¶¶ 20–21.)  On another occasion, after Hellman left Equine Imaging, Papaioannou sent old, rusty equipment to a customer that he tried to pass off as new.  (Doc. 111-6 ¶¶ 35–38.) Several other customers similarly suspected that the Equine Imaging equipment they received was used.  (Doc. 111-5 ¶¶ 16, 18; Doc. 112 ¶ 5(d); Doc. 113-1 61:23–63:12.)  Customers have also reported that they never received their equipment, (Doc. 111-5 ¶ 19; Doc. 113-3 ¶¶ 20–21), or received it much later than the agreed-upon date and with Defendants requesting additional payments, (Doc. 112 ¶ 5(g)).  When Hellman worked for Equine Imaging, he repeatedly heard Papaioannou say that "only in America can you screw people over like this."  (Doc. 111-6 ¶ 11.)

### D.  *Plaintiff Discovers the Misrepresentations*

On or around June 2015, Yarbrough discovered the following facts, which run counter to Defendants' representations:

- Defendants' technology was not stable, commercially viable, or able to image all parts of a horse's body, which Yarbrough discovered after witnessing a demonstration of Defendants' machine at the office of ABB Robotics ("ABB"), the company that manufactures the robotic arms for Defendants' machines, (Doc. 114 ¶¶ 24–26);

- Papaioannou had not yet developed motion correction software, meaning that if a horse moved around while being scanned, the images would be unusable, (*id.* ¶ 27); and

- Defendants' used Plaintiff's deposit to fund development of machine technology, not for the parts and materials needed to fulfill Plaintiff's order, (*id.* ¶ 28; *see generally* Doc. 111-6 ¶ 16).

At the end of 2016, with Plaintiff's order still unfulfilled, Plaintiff came to believe that it would need to find a replacement machine.  (*Id.* ¶¶ 31, 52; *see also id.* ¶ 50 (Hellman stating that "[b]y November 2016, it was clear that Papaioannou was never going to send Dubai its system").)  To that end, Plaintiff entered into a contract with ABB to purchase two robotic arms for $185,000 (plus shipping) that it planned on using to build its own CT scanner.  (Doc. 114 ¶ 33.)  Papaioannou was included on an email on November 17, 2016, related to the invoice for this purchase.  (Doc. 114-6.)  Plaintiff wired the money to ABB on November 21, 2016.  (Doc. 114 ¶ 33, Doc. 114-5.)  ABB received permission from Papaioannou before entering into this transaction with Plaintiff.  (Doc. 113-2, at 41:4–21.)  In November 2016, Plaintiff sent money to Hellman to purchase the parts to construct the machine, including an X-ray machine and panel and motion correction cameras.  (Doc. 114 ¶ 35; Doc. 111-6 ¶ 52.)  At the time Plaintiff sent Hellman the money, he knew that Papaioannou had these parts in the Equine Imaging warehouse.  (Doc. 114 ¶ 36.)  Hellman purchased the parts for Plaintiff from Equine Imaging on December 8, 2016.  (Doc. 111-6 ¶ 53; Doc. 114-7.)  Papaioannou ordered that Hellman send the parts to Purdue University, another one of Defendants' clients, but Hellman personally crated and sent the parts to Plaintiff.  (Doc. 111-6 ¶¶ 54–56.)

### E.  *Plaintiff's Issues Upon Receiving the Parts*

Upon receiving the parts, Plaintiff paid engineers and other professionals to install the machine, which was completed in April 2017.  (*See, e.g.*, Doc. 88-10; Doc. 88-11; Doc. 88-17; Doc. 88-20; Doc. 88-21; Doc. 88-23; Docs. 88-31–48; Doc. 111-6 ¶ 57; Doc. 114 ¶ 39.)  After

the machine was installed, the X-ray machine required service.  (Doc. 114 ¶ 40.)  Yarbrough

contacted the X-ray manufacturer for assistance only to be told that Defendants had never paid

the manufacturer for the X-ray machine or for other components of the machine that Plaintiff

purchased from Defendants.  Therefore, the X-ray manufacturer refused to service Plaintiff's

parts.  (*Id.* ¶¶ 40–41; *see also* Doc. 111-6 ¶ 53.)  Sometime later, Hellman "called the

manufacturers for several other components of the machine, all of which were purchased from

Defendants, [only to be again] told [] that Defendants had not paid for the parts."  (Doc. 114

¶ 41.)  As a result, the manufacturers refused to provide Dubai service.  Consequently, Plaintiff

paid $149,927 to Defendants, through Hellman, for component parts for the replacement

machine.  (*Id.* ¶ 42.)  Plaintiff also incurred nearly $113,000 in installation, repair, and

maintenance costs until April 2018, when the warranty on their agreement with Defendants

expired.  (Doc. 114-9.)

## IV.   Discussion

### A.  *Defendant's Failure to Provide a Defense*

As an initial matter, I find that Defendants have failed to oppose Plaintiff's motion.  On

December 30, 2020, I entered default judgment as to liability against Equine Imaging, (Doc. 93),

meaning that it cannot oppose Plaintiff's motion.  I further find that Papaioannou failed to

comply with three separate deadlines related to his opposition motion for summary judgment,

and failed to provide anything that could be reasonably construed as a properly filed opposition

motion; therefore, Papaioannou did not provide any opposition to Plaintiff's motion.

Papaioannou missed three separate deadlines to respond to Plaintiff's motion for

summary judgment.  First, Papaioannou did not submit his opposition by the initial date of May

12, 2021—a deadline that I made clear to Papaioannou in two separate orders.  (*See* Docs. 104,

108.)  Papaioannou cannot, and does not, claim that this deadline did not give him enough time

to submit his brief because Papaioannou himself proposed a briefing schedule in which he would

have submitted his opposition motion on April 2, 2021, more than a month sooner than the

briefing schedule I entered.  (*See* Doc. 96.)  Papaioannou not only failed to submit an opposition

motion by May 12, 2021, but also failed to request an extension until May 31, 2021, nearly three

weeks after his deadline passed.  (*See* Doc. 120.)  In requesting an extension, Papaioannou

represented that he had a bike accident on May 2, 2021, which prevented him from walking,

sitting, and driving.  (*Id.*)  Assuming Defendant's representation was true, it still did not fully

explain why he was unable to submit an opposition or timely request an extension.  I further note

that in his May 31, 2021 filing, Papaioannou did not request that I treat his April 14, 2021 letter

containing two affidavits as his opposition to Plaintiff's motion.  (*See* Doc. 109.)  Given that this

filing (1) was submitted before Plaintiff even filed its motion for summary judgment, (2) does

not clearly identify itself as an opposition motion, (3) contains affidavits with case captions that

do not match this one and dates that do not match the filing date, Papaioannou's April 14, 2021

letter does not qualify as a properly filed opposition motion.

Second, Papaioannou failed to submit his opposition motion after I extended his deadline,

at his request, until June 15, 2021.  (Doc. 122.)  As noted *supra*, between the time that I granted

Papaioannou's extension until June 15, 2021, he submitted only one four-page letter in which he

asked for another extension to produce materials.  (Doc. 123.)  That letter was not labeled as an

opposition motion, nor did it contain any substantive argument in response to Plaintiff's motion.

(*See id.*)  In a subsequent filing, Papaioannou stated that he did not timely receive my order in

which I granted his extension until after the June 15, 2021 deadline had already passed.  (Doc.

125.)  Assuming this is true, this is a nonsensical response because I granted Papaioannou the

exact extension he requested in his May 31, 2021 letter.  (Doc. 109.)  In other words, I gave

Papaioannou the longest possible extension he could have reasonably expected when he filed his

May 31, 2021 request, meaning that it is irrelevant whether or not he saw my order granting his

request.  If I had denied his request, his opposition motion would have only been due earlier than

June 15, 2021.  Therefore, Papaioannou forfeited his opportunity to oppose Plaintiff's motion by

failing to submit an opposition motion by his requested date, especially given my clear warning

that I would "not grant any subsequent extension requests and, if [Papaioannou did] not file his

brief by that date, I [would] consider Plaintiff's motion [for summary judgment] as unopposed."

(Doc. 122.)

Third, after I gave him a final opportunity, Papaioannou failed to submit a filing

indicating which materials, if any, he intended to serve as his opposition motion.  Between the

July 14, 2021 conference and the July 23, 2021 deadline for Papaioannou to submit a filing

providing this information, Papaioannou submitted eleven filings on ECF and two flash drives to

my Chambers.  (Docs. 136–46.)  Papaioannou does not identify in any of these documents or

files any filing submitted on or before June 15, 2021 that Papaioannou intended to serve as his

opposition motion.  The vast majority of the voluminous materials submitted in these filings are

images, emails, PDFs files, or other materials.  I do not know why Papaioannou filed or sent me

these materials.  Perhaps he intended them to serve as exhibits or other materials that

Papaioannou wanted to produce to Plaintiff.  In any event, the only filings that Papaioannou has

submitted to me, either on ECF or on his flash drives, that might conceivably be interpreted to be

a legal brief or argument are a handful of affidavits.  However, these affidavits—which are not

identified as an opposition motion and do not contain any statement of facts as required under

Local Rule 56.1—were either filed in different litigations or submitted before Plaintiff ever

submitted its motion for summary judgment in this case.  Even construing Papaioannou's filings as liberally as possible, I cannot point to any filing that at all resembles an opposition brief, let alone one that was timely filed and otherwise accords with the requirements of the Federal Rules of Civil Procedure, the Local Rules of the Southern District of New York, and my Individual Rules and Practices.

I note finally that Papaioannou's conduct throughout this case belies any possible claim of prejudice in this ruling.  Unlike many pro se litigants, Papaioannou was represented by counsel for nearly two full years:  between September 10, 2018 and May 4, 2020, and then again from June 26, 2020 to September 21, 2020.  Both attorneys withdrew because Defendants had failed to pay them tens or hundreds of thousands of dollars in legal fees.  (*See* Docs. 46, 69–70.) On multiple occasions, I stayed all deadlines in this case, and granted Defendants several extensions of those stays, to allow Defendants to seek counsel.  After discovery in this case had already closed, Papaioannou requested, and I granted, a three-month extension of discovery deadlines to allow Papaioannou to request and produce all materials necessary for him to defend his case.  (Doc. 93.)  I then granted Papaioannou another weeklong extension of this discovery deadline to allow him to complete his production of materials to Plaintiff, which he represented would take only "a few days."  (Doc. 98.)  I was under no obligation to grant either of these extensions.  *See* Fed. R. Civ. P. 6(b)(1).  This case has been pending for more than four years now, in no small part because I have granted Papaioannou a slew of extensions with which he has failed to comply.  Papaioannou's conduct in this case has clearly prejudiced Plaintiff, which has spent an inordinate amount of time dealing with disputes with Papaioannou regarding discovery and briefing deadlines.  Papaioannou's pro se status does not excuse his failure to even vaguely approximate compliance with my orders.  Unable to identify any filing that even

resembles an opposition motion, let alone one that was timely filed in accordance with the procedural rules of this Court, I am compelled to find that Plaintiff's motion for summary judgment is unopposed.

### B. *Breach of Contract*

"Under New York law, the elements of a cause of action for breach of contract are (1) the existence of a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages suffered as a result of the breach." *Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, 438 F. App'x 20, 21–22 (2d Cir. 2011).  A breach is material if it "go[es] to the root of the agreement between the parties [and] is so substantial that it defeats the object of the parties in making the contract." *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997).

Here, this analysis is straightforward and establishes that Plaintiff has carried its burden to demonstrate a breach-of-contract claim.  As to the first factor, Plaintiff submitted a document titled Quotation/Order Order Summary showing an agreement for Plaintiff to pay $995,000 to Equine Imaging in exchange for the machine and a one-year warranty, (Doc. 114-2), as well as sworn declarations from Yarbrough and Hellman attesting to that agreement, (*see* Doc. 111-6 ¶ 9; Doc. 114 ¶ 15).  These materials are sufficient to show "an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound," including "agreement on all essential terms." *Stapleton v. Barrett Crane Design & Eng'g*, 725 F. App'x 28, 31 (2d Cir. 2018).

With regard to the second factor, Plaintiff honored the contract, timely paying Defendants $546,104 in two deposits.  (Docs. 114-3, 114-4.)  Although Plaintiff did not pay Defendants the full $995,000 provided for in the contract, Plaintiff was not required to complete full performance because Defendant breached the contract by failing to timely deliver the machine.

*See Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) ("Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach.").

With regard to the third factor, Defendants clearly breached the contract. While Defendants estimated that they would deliver the machine by June 2015, (Doc. 114-1, at 55), they never delivered the machine, (Doc. 114 ¶ 23). In other words, Defendants failed to perform its core, and only, obligation under the agreement. Finally, Plaintiff has established damages since it paid $546,000 for the machine that was never delivered, and also may be entitled to damages in connection with the hundreds of thousands of dollars it spent on components parts, installation, repair, and maintenance costs. (*See* Doc. 114 ¶ 42; Doc. 114-9.) Taken together, there is no genuine issue as to any material fact that Defendants breached the contract.

Next, I consider whether Papaioannou can be held liable for the breach. "A director is not personally liable for his corporation's contractual breaches unless he assumed personal liability, acted in bad faith or committed a tort in connection with the performance of the contract." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1177 (2d Cir. 1993). Here, I find that Papaioannou can be held individually liable for the Corporate Defendant's contractual breach because, as I will describe in greater detail *infra*, he acted in bad faith—based on the fraudulent representations he made and his dishonest behavior in his dealings with Plaintiff.

## C. *Unjust Enrichment and Money Had and Received*

I next consider Plaintiff's unjust-enrichment and money-had-and-received claims together. Both claims are quasi-contract claims. Courts cannot permit recovery on quasi-contract claims where there is a valid contract, and a plaintiff seeks to recover the same relief

under breach of contract as he does for his quasi-contract claims.  *See Marshall v. Hyundai Motor Am.*, 51 F. Supp. 3d 451, 470 (S.D.N.Y. 2014) ("[W]hen a matter is controlled by contract, the plaintiff has no valid claim for unjust enrichment under New York law.") (internal quotation marks omitted); *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572 (N.Y. 2005) (holding unjust enrichment "is an obligation the law creates in the absence of any agreement" and that such a claim does not survive "the matter is controlled by contract"); *Lenco Diagnostic Labs., Inc. v. McKinley Scientific, Inc.*, No. 15-CV-1435, 2020 WL 3840562, at *3 (S.D.N.Y. July 7, 2020) ("[W]here a matter is controlled by contract and the claim for unjust enrichment seeks the same relief as is sought for breach of contract, the unjust[-]enrichment claim is properly dismissed as duplicative." (internal quotation marks omitted)); *Rensselaer Polytechnic Inst. v. Varian, Inc.*, 340 F. App'x 747, 749 (2d Cir. 2009) (holding that money-had-and-received claim "is one in quasi contract [that] does not lie where, as here, there is a valid contract between the parties respecting the matter at issue" (internal quotation marks omitted)) (summary order); *Ind. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir. 1998) (affirming dismissal of money-had-and-received claim where "there is a valid contract between the parties respecting the matter at issue").

As noted *supra*, I have already found that a valid contract existed between the parties. Further, for damages for breach of contract, Plaintiff makes clear that it seeks redress for the $149,927 it paid Defendants for machine parts to build a replacement machine.  (*See* Doc. 111-2, at 22.)  Therefore, because there is a valid agreement and Plaintiff seeks the same relief in its quasi-contract claims as it does in its breach-of-contract claims, Plaintiff is not entitled to judgment under either quasi-contract theory and those claims are dismissed.[2]  *See 4Kids Ent.,*

---

[2] I note for the record that if there were no valid contract here, Plaintiff would be entitled to recover under both quasi-contract claims.  The elements for both unjust enrichment and money had and received are very similar:  (1)

*Inc. v. Upper Deck Co.*, 797 F. Supp. 2d 236, 241 (S.D.N.Y. 2011) (sua sponte dismissing unjust enrichment and other quasi-contract claims where the defendant was liable for breach of contract); *Pro. Merch. Advance Cap., LLC v. C Care Servs., LLC*, No. 13-CV-6562, 2015 WL 4392081, at *6 (S.D.N.Y. July 15, 2015) (sua sponte dismissing unjust-enrichment claim where the defendants were liable for breach of contract).

### D. *Fraud and Fraudulent Inducement*

Next, I consider Plaintiff's fraud and fraudulent inducement claims because my analysis for both claims is similar.  Under New York law, "[t]he elements of a fraud cause of action consist of a misrepresentation or a material omission of fact which was false and known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Pasternack v. Lab. Corp. of Am. Holdings*, 59 N.E.3d 485, 491 (N.Y. 2016) (internal quotation marks omitted).  "To state a claim for fraudulent inducement under New York law, a plaintiff must allege:  (1) a representation of material fact, (2) which was untrue, (3) which was known to be untrue or made with reckless disregard for the truth, (4) which was offered to deceive another or induce him to act, and (5) which that other party relied on to its injury." *Kainz v. Bernstein*, 841 F. App'x 249, 251 (2d Cir. 2020) (summary order) (internal quotation marks omitted).

Sworn testimony from both Yarbrough and Hellman demonstrates that the following representations Defendants—and Papaioannou specifically—made to Plaintiff were false:  (1)

---

Defendants were enriched, (2) at Plaintiff's expense, and (3) equitable factors weigh against Defendants being able to keep that money.  *See Grynberg v. ENI S.P.A.*, 503 F. App'x 42, 43 (2d Cir. 2012) (summary order) (unjust enrichment); *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215 (N.Y. 2007) (money had and received).  Defendants were plainly enriched at Plaintiff's expense because Defendants failed to honor the original contract, and because Defendants did not pay the manufacturers for the parts.  Equity and good conscience clearly militate against permitting Defendants to keep the money at issue here.  As such, if the parties' agreement did not preclude Plaintiff's quasi-contract claims, it would have satisfied the elements necessary to establish both its unjust-enrichment and money-had-and-received claims.

that Defendants' machines were stable and commercially viable; (2) that Defendants' machines were able to image all parts of a horse's body; (3) that Defendants had developed the machine's motion-correction software; (4) that Defendants would use the deposit to purchase the parts and materials needed for Plaintiff's order; and (5) that Defendants would timely deliver the machine. (*See supra* Section III.D.)

I find that there is insufficient evidence at this time to determine that, when he made these representations, Papaioannou knew that he would not deliver the machine on time, or at all. However, there is sufficient evidence to establish that, at the time he made these representations, Papaioannou knew that his machines were not fully operational and were unable to scan all parts of a horse's body. (*See, e.g.*, Doc. 111-6 ¶¶ 42–46.)

With regard to intent, I find that Papaioannou made these misrepresentations for the purpose of inducing Plaintiff to purchase the machine. This factor is the most difficult one for Plaintiff to establish, because most of Plaintiff's evidence about intent relates to general statements that Papaioannou made in settings outside of the transaction at issue here. (*See, e.g.*, 111-6 ¶¶ 11–13.) However, "Plaintiff need not come forward with direct evidence, as fraudulent intent is rarely susceptible to direct proof and must ordinarily be established by circumstantial evidence and the legitimate inference arising therefrom." *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 222 (S.D.N.Y. 2007) (internal quotation marks omitted). Indeed, a moving party can sufficiently establish fraudulent intent both for fraud and fraudulent inducement claims where "circumstantial evidence . . . supports a strong inference that the defendants possessed the requisite fraudulent intent." *Taylor Precision Prods., Inc. v. Larimer Grp., Inc.*, No. 15-CV-4428, 2018 WL 4278286, at *20 (S.D.N.Y. Mar. 26, 2018) (internal quotation marks omitted); *see also Martell Strategic Funding LLC v. Am. Hosp. Acad.*, No. 12-

CV-627, 2019 WL 632364, at *12 (S.D.N.Y. Feb. 14, 2019) (citing same standard in fraudulent inducement context).

Here, I find that Plaintiff has met its burden to establish a strong inference of fraudulent intent for several reasons.  First, Defendants' own employee from the time at issue provided sworn testimony that Papaioannou repeatedly made such glaringly false representations to clients about the capacity of the technology such that it strains credulity to believe Papaioannou was simply mistaken.  (*See* Doc. 111-6 ¶¶ 42–46.)

Second, Plaintiff established that, by the time he entered into business with Plaintiff, Papaioannou had a longstanding history and practice of making misrepresentations to clients— passing off old equipment as new, entering into agreements only to refuse to send equipment, and, most importantly, making the same or similar misrepresentations about the equipment's capacity at issue in this litigation.  (*See supra* Section III.C.)

Third, sworn testimony by Hellman reveals that Papaioannou had full knowledge of the falsity of at least some of these representations, noting to Hellman that he was "not in jail yet" after Hellman confronted him about misusing client deposits, (Doc. 111-6 ¶ 34), instructing Hellman not to worry about refusing to timely fulfill orders, (*id.* ¶ 33), and directing that old equipment be covered with fresh paint to try to pass it off as new, (*id.* ¶ 37).

Fourth, Papaioannou's slideshow presentation makes clear that he made these misrepresentations about the capacity of the machine to induce Plaintiff to purchase the machine. In the slideshow, under a header of "Equine Imaging Challenges," Papaioannou listed "[l]imited scanning geometry" and "undesired movement during scanning," before noting that "[r]obots and automation eliminate geometry/configuration problems."  (Doc. 114-1 ¶¶ 4–8.)  In other words, Papaioannou identified two problems with existing technology available to Plaintiff—that

it could not do a full body scan and that it required the horse to be still, thus requiring the horse would to be anesthetized—and then made misrepresentations about how his new technology solved both those problems.  Given that Plaintiff executed the agreement the day after this presentation, I have no trouble concluding that the misrepresentations induced Plaintiff to buy Defendants' machine.  With regard to the final element of the fraud and fraudulent inducement claims, I have already determined that Plaintiff was injured as a result of entering into the agreement with Defendants.

I note as a final matter that although "it is well settled under New York law that a contract action cannot be converted to one for fraud merely by alleging that the contracting party did not intend to meet its contractual obligations," *Astroworks, Inc. v. Astroexhibit, Inc.*, 257 F. Supp. 2d 609, 616 (S.D.N.Y. 2003) (internal quotation marks omitted), "a valid fraud claim may be premised on misrepresentations that were made before the formation of the contract and that induced the plaintiff to enter the contract," *Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994). In other words, while "promissory statements as to what will be done in the future . . . give rise only to a breach of contract claim," false statements "of present fact . . . create a separable claim of fraudulent inducement" and fraud.  *Le Metier Beauty Inv. Partners LLC v. Metier Tribeca LLC*, No. 13-CV-4650, 2015 WL 769573, at *6 (S.D.N.Y. Feb. 24, 2015).  As noted *supra*, Plaintiff's fraud and fraudulent inducement claims are principally based on the misrepresentations about present facts—namely, the capacity and quality of Defendants' equipment—that Papaioannou made to induce Plaintiff to agree to purchase Defendants' equipment.  As such, I find that Plaintiff is entitled to judgment on both these claims.

### E.   *New York GBL Section 349*

New York GBL Section 349 makes unlawful "[d]eceptive acts or practices in the conduct

of any business trade or commerce or in the furnishing of any service."  To prevail under a

Section 349 claim, a plaintiff must establish that "(1) the challenged transaction was consumer-

oriented; (2) defendant engaged in deceptive or materially misleading acts or practices; and (3)

plaintiff was injured by reason of defendant's deceptive or misleading conduct."  *Denenberg v.

Rosen*, 71 A.D.3d 187, 194 (1st Dep't 2010) (internal quotation marks omitted).

"Although a monetary loss is a sufficient injury to satisfy the requirement under § 349,

that loss must be independent of the loss caused by the alleged breach of contract."  *Spagnola v.

Chubb Corp.*, 574 F.3d 64, 72 (2d Cir. 2008); *see also Silvester v. Selene Fin., LP*, No. 18-CV-

2425, 2019 WL 1316475, at *9 (S.D.N.Y. Mar. 9, 2019); *Fleischer v. Phoenix Life Ins. Co.*, 858

F. Supp. 2d 290, 304–05 (S.D.N.Y. 2012).  Here, Plaintiff fails to identify any monetary loss as a

result of Defendants' purported violation of Section 349 that is distinct from the monetary loss in

its breach of contract claim.  Accordingly, the Section 349 claim is dismissed.

### F.   *Conversion*

"To state a claim for conversion, a plaintiff must allege facts sufficient to establish that

the defendant acted without authorization, defendant exercised dominion or right of ownership

over property belonging to the plaintiff, plaintiff has made a demand for the property, and that

demand has been refused."  *Harris v. Coleman*, 863 F. Supp. 2d 336, 342 (S.D.N.Y. 2012).

"[A]n action for conversion 'does not require defendant's knowledge that he is acting

wrongfully, but merely an intent to exercise dominion or control over property in a manner

inconsistent with the rights of another.'"  *Newbro v. Freed*, No. 06-1722-CV, 2007 WL 642941,

at *1 (2d Cir. Feb. 27, 2007) (quoting *LoPresti v. Terwilliger*, 126 F.3d 34, 41 (2d Cir. 1997)

(internal quotation marks omitted)).  "Plaintiff must also demonstrate legal ownership or an immediate superior right of possession to a specific identifiable thing."  *Harris*, 863 F. Supp. 2d at 342 (internal quotation marks omitted).

"A claim of conversion cannot be predicated on a mere breach of contract."  *Harlet at Willow Cr. Dev. Co., LLC v. Ne. Land Dev. Corp.*, 64 A.D.3d 85, 112 (2d Dep't 2009) (internal quotation marks omitted).  To sustain a conversion claim alongside a breach of contract claim, a defendant must breach a duty that "is independent of the contract itself."  *Lenard v. Design Studio*, No. 08-CV-10560, 2014 U.S. Dist. LEXIS 45629, at *30 (S.D.N.Y. Mar. 3, 2014).

Here, Plaintiff premises its conversion claim on the fact that after Plaintiff paid Defendants pursuant to the agreement and Defendants "refused to return" these monies.  (Doc. 111-2, at 8; *see also* (Doc. 114 ¶¶ 31, 45.)  Defendants' duty here stems entirely from its contractual duties to Plaintiff.  As such, I find that Plaintiff is not entitled to summary judgment on its conversion claim because Defendants did not breach any duty independent of their contractual obligations.  For that reason, the conversion claim is dismissed.

### G. *Damages*

Plaintiff requests a total of $1,325,042.31 in damages for breach of contract—restitution damages in the amount of $546,104, expectation damages in the amount of $447,834.31, and loss of value damages in the amount of $331,104.  (Doc. 111-2, at 22–23.)  However, Plaintiff's briefing in support of its damages calculation is plainly inadequate.  For instance, Plaintiff fails to cite any legal authority in support of its request for $331,104 in damages for "loss in value."  (*Id.*)  Moreover, Plaintiff fails to explain how the costs it incurred to maintain the machine "during what should have been the one-year warranty period under the contract with Defendants" were in fact covered by the warranty.  (*Id.*)  For these reasons, I refer the issue of

damages to Magistrate Judge Valerie Figueredo for an inquest.[3]  The parties are directed to Judge Figueredo's Individual Practices in Civil Cases.

### V.     Conclusion

For these reasons, Plaintiff's motion for summary judgment is GRANTED in part and DENIED in part.

Plaintiff's motion is GRANTED as to liability for its claims of breach of contract, fraud, and fraudulent inducement.  Plaintiff's motion is DENIED as to its claims under GBL Section 349, and for unjust enrichment, money had and received, and conversion.  For the reasons explained above, the GBL Section 349, unjust-enrichment, money-had-and-received, and conversion claims are DISMISSED.

To the extent Plaintiff believes it has received an insufficient opportunity to oppose my dismissal of these claims, it may supplement the record and file a brief opposing the sua sponte summary judgment within fourteen days of this Opinion & Order.

It is hereby

ORDERED that the issue of damages is referred to Magistrate Judge Figueredo for an inquest.

IT IS FURTHER ORDERED that to the extent Plaintiff seeks attorneys' fees based on a source other than New York GBL Section 349, the issue of Plaintiff's entitlement to attorneys' fees and the amount of such fees is also referred to Magistrate Judge Figueredo.

---

[3] Plaintiff represents that it incurred attorneys' fees and costs in connection with this litigation, (Doc. 111-2, at 23), but neither specifies the amount of its claim nor provides documentation to support the request.  To the extent that Plaintiff's request for attorneys' fees is based on GBL Section 349, its claim for fees must be denied in light of my dismissal of the Section 349 claim.  To the extent, however, that Plaintiff seeks attorneys' fees on other grounds, I similarly refer adjudication of that issue to Magistrate Judge Figueredo.

The Clerk of Court is respectfully directed to terminate the motion at Doc. 111.

SO ORDERED.

Dated: April 9, 2024
      New York, New York

                                        Vernon S. Broderick
                                        United States District Judge